Okay. We have our little traffic lights that we hope you will observe. When the yellow light comes on, you have two minutes. When the red light appears, you may conclude your argument immediately unless you're responding to a question from the court. We are acquainted with the briefs and record excerpts. We have not always read the record before we come in here, so we do appreciate record citations. And with that, the first case is No. 21-40091, United States v. Alvarez. We'll hear first from Mr. Martin. May it please the Court, my name is Scott Martin. I represent Mr. Alvarez in this appeal of the denial of his motion to suppress the revolver and ammunition that police officers found in his possession when they stopped him on his bicycle and patted him down. These officers made a couple of big mistakes right from the start. First, they erroneously believed that Mr. Alvarez was violating a city ordinance by riding his bicycle on that sidewalk, and that error is not in dispute. Second, as for their plan to round up gang members with outstanding warrants, they got the wrong guy. See, that error is not in dispute. It's not before us because the government isn't pressing good faith? Yes, Your Honor. They've waived that, essentially by not briefing it. The district court did not reach that question, but our position is that not only have they waived it, but that it was not objectively reasonable and the government could not show that. This zone was never in B-5 or B-6, as the testimony at the suppression hearing showed. So the government wouldn't be able to make that showing anyway. As for their plan to round up gang members with outstanding warrants, they got the wrong guy. Mr. Alvarez was not the man they were looking for. Our argument is that the description He was a felon in possession in a bad part of town. Your Honor, he was in possession of a firearm that he was not supposed to have. He was a felon, a perpetrative person with a firearm. The fact that he is in a high-crime area or a gang, an area where there was gang-related activity, nothing observed by the officers connected him to that gang activity. And as we know from McKinney and Illinois v. Wardlaw, a person's presence in an area of expected criminal activity standing alone is not enough to support a reasonable, particularized suspicion that the person is committing a crime. This case is not like Flowers, which the government submitted a 28-J, where the officers were tasked with patrolling an unsavory neighborhood to look for suspicious behavior and saw two people parked in a car. To me, I mean, that aspect of it, I'm not saying it's controlled by Flowers, but that aspect of it certainly makes sense. Their gang task force and the policemen here has been on the gang unit for 30-some years. Well, Your Honor, there was— They are looking for gang members with warrants under very dangerous— The description, Your Honor, the description they had of this individual they were looking for whose name was— A Hispanic male on a bicycle with big handlebars. A Hispanic male who at some point in the past had been seen riding a bicycle with large handlebars and had fled from police, from officers in this area, Leopard and Upriver Roads. Hispanic male, as we've argued, is broadly generic because it doesn't describe the person's age, height, weight, hair, or skin color. Are police—just I'm querying you from your expertise—are police forbidden to use loaded terms like racial descriptions now? No, Your Honor. Our position is that this was a—Hispanic is not valuable as a descriptor in these kinds of cases because it's broadly generic. Well, suppose it had been a young Hispanic or a Hispanic between the ages of 17 and 25. Would that be closer? That would be close. Your Honor, that would be closer, but in Jones, this U.S. v. Jones, the description was far less specific than we have here. There, it was a black male, which this Court found to be too general because it could plainly affect many people. The description that the Court found was incomplete and stale of a gas station robbery suspect, which the officer had heard the day before on the dispatch, was a black male, 5 feet 6 inches to 5 feet 9 inches tall and weighing between 150 and 180 pounds with a medium Afro hairstyle who was wearing jeans and a long denim jacket. That's far more specific. Did you cite Jones to Judge Ramos in your motion to suppress? Not in our motion to suppress. We've cited it in our brief. You did cite it in the brief. No, I know. It seemed very on point to me. But it's—the description that we have here is far less specific than the one in Jones, which this Court found to be broadly specific. Now, large handlebars— But I guess back on Judge Jones's question, black there is a physically identifying characteristic—black and white. Hispanic is a cultural term. It doesn't denote anything about appearance—Spanish-speaking, Spanish country, right? That's our—yes, that's correct, Your Honor. It's an ethnicity. Why are they under Title VII if it's not racial? Well, according to the Census Bureau, it's not a race. They're in Title VII, aren't they? Your Honor, I believe so. Of course they are. They're in the Voting Rights Act, aren't they? That's correct. But our position here is that it is not valuable as a description. It says nothing about a person's appearance. It's like calling someone Slavic or Latino. It doesn't—you can be white, black, you can be anything. It doesn't help research or identify somebody. Right. You could look like the actor Antonio Banderas, who's from Spain, or you could look like Sammy Sosa from the Dominican Republic, and they look very different skin color. It's not very descriptive of how they appear, which is what we're looking for. You don't know anything about Afro-American shades of color, do you? Well, you— It's all not to the point, so get to the point. I'm sorry to— The second— This is Officer Martin De Leon, so presumably he might know something about what Hispanics look like. Well, Your Honor, he did not, when it comes to the bicycle, which I was discussing before, he did not know whether the handlebars were tall or whether they were wide, like a beach cruiser, or tall like an easy rider, just had really big grips. He didn't know the color of the bicycle, whether this is an older beat-up bike or a newer bike, thick tires or skinny tires, whether it had pegs or some other distinguishing feature. He admitted all this. He didn't know any of these things, and he couldn't really describe or articulate what large handlebars meant. He just thought, not regular size. Would this case be different if the police had received a 911 call and said, let's say, a Hispanic male was seen fleeing from the scene of a robbery on a bicycle with large handlebars? Could the officers detain that suspect under those circumstances? Hispanic male seen fleeing from the scene. Well— And it was, let's say, it was 30 minutes. 30 minutes. Well, 30 minutes would be longer than the 15 minutes in Jaquez, which is a case we've cited in our brief, which involved— I'm just asking, is it a different analysis? Do we take a different analysis when you're talking about there's been a crime, we're looking for this? Okay, so a crime an hour ago. Let's say an hour ago. It would be a stronger case for the government if it was a recent case, and they were looking for someone in that particular area that matched the description that you say. It would be a better case for the government in that sense, because they would be looking for some particular recent crime. Here, we don't know when this person was last seen. The officer testified he didn't know if it was earlier that day. The person you're talking about is the guy with the warrant. Yeah, the guy with the warrant. Jose Morales, who is obviously not our client. So this information was potentially stale, unlike the hypothetical that you propose, Judge Duncan. Didn't Jones make that distinction in terms of the specificity that police— Well, Jones did make that distinction, and in Jones, the officer had heard the day before about a gas station robbery, and he did not—the officer in that case did not know exactly when the robbery took place. He had just heard the day before about a gas station robbery, and he saw Jones, and that's when he decided to approach Jones on this incomplete and stale description that he had. Now, officers are entitled to rely on information conveyed by others, right? What is that called? The collective— Collective knowledge. Why wouldn't that help the government here? Well, in this case, the description they have came from others, because Officer DeLeon does not recognize this defendant and did not know his name, even. That's clear from the video, and it came out in the testimony. So the collective knowledge was that there was this description of this person, Jose Morales, who was known to police and his name, but we don't have anything more than that. So we're going off this general, vague description, and we have officers out there looking for someone who they think matches this vague description, and our argument is that the description is too generalized and broadly applicable to create the kind of specific, articulable suspicion that was needed to justify Terry's stop. If there were some physical descriptor—dreadlocks, red hair—probably that would work. Trouble is here, it's just a guy on a bike. Is that basically it? That's correct, Judge Higginson, and that, together with the fact that the time and place is unclear. I mean, the court found that the officer had been given no information about when or specifically where in that area this person was last seen. Now, that cannot be the case. You would stop all of this gang-related seeking out people with arrest warrants if you had to have a time and a place, because by definition, this is a person with a warrant out. It is not a person suspected of an immediate crime, right? You're entitled to arrest somebody who has a warrant on his head. I agree with that, Judge Jones. Well, time and place has nothing to do with this. Well, I disagree with that, Your Honor. If they had a description that this— You could see him picking up his kids at school if you know it's the person, if you have extrinsic reasons for believing it's that person. Your Honor, our position is if they had information that Jose Morales, the real Jose Morales, rides his bike on this street every day at a specific time, that would help their case with the totality of the circumstances. But you're never going to know that about people who have warrants on their heads, because by definition, they are perpetrators who have fled. Well, in this case, Your Honor, Mr. Alvarez did not flee. He— Actually, he didn't pay any attention to them, so— He ignored them, exactly, Your Honor, which he's entitled to do under ward law. And, in fact, the government in its— Was the dash cam played at the suppression hearing? Your Honor, there is a dash cam. Not a dash cam. It's a body cam video. Was it played at the suppression hearing? Yes. And it is in the record, but it does not show the actual stop. But does it show as they're driving alongside, hey, buddy, pull over? No. No, it doesn't. No. It is an officer who arrives on the scene after the fact. His name is Officer— So is it plus or minus, in your mind, the Terry authority? Does whatever's on that video, does it favor or disfavor? Does it add to the totality to— It's after the fact. We have a picture of the bike. It's a neutrality. It's a neutrality. And, in fact, the discussions that the officers have in the video show that Officer DeLeon had no idea what the guy looked like. He's asking, who said that? And they said, somebody said, Jose Morales. And Officer DeLeon says, who said that? And they say, it was Officer Hasek. So they have to call Officer Hasek to find out who's Jose Morales, what does he look like, all right? So these officers had no idea. These particular officers who made the stop had no idea what Jose Morales looks like. All they had was this general description. So it lessens the reasonable suspicion that the government had. Did your office handle the conditional plea? Yes, Your Honor, we did. Because, I mean, you have an appeal issue, but no one moved to expedite. Government got extended time on its brief. The guy's already served his full amount of time. He'd served it by sentencing, right? Yes, Your Honor, but we're attacking— Well, Your Honor, he's a state custody. In fact, the state never dropped the gun charge for this case. I saw that, but Judge Ramos sentenced him 18 months, Ramos sentenced— Time served. Time served. Yes. And he has a supervised release term as well. So he's still within his supervised release term. But also— What's the state done with the gun, the parallel gun? It's still pending? It's still pending. The trial date has been reset a couple times, and I think the trial date most recently was to late January. So he still has the gun case in state court. But I'd like to get back to this flight issue. Again, as Judge Jones rightly pointed out, he ignored them, and that's how the government described it at Roa 45 of their response to the suppression motion. While officers attempted to get the defendant to stop, he ignored them. However, he didn't immediately stop on the request of the officers and continued on his way. That's how the government described it. So we say this case is not like the ones where the defendant exhibited nervous or evasive behavior, like Wardlaw, where the guy took headline flight. He was standing with a bag, and police came up to him, and he ran down an alley to get away. Or Lawson, which is a case cited in the government's brief, where the guy started walking swiftly and then acted nervously and ran across a traffic-filled street to get away. We say this case is more like Johnson, the Sixth Circuit case that I've cited in our brief. In that case, the officers responding to a 911 call arrived on the scene. They did not have reasonable suspicion to stop Mr. Johnson as he was walking with a bag towards a car, and he kept walking at the same pace, and officers called for him to stop. The Sixth Circuit said he was entitled to do that under Wardlaw, and it was not independently suspicious because he didn't run, he didn't make any evasive movers. He just walked as if doing the thing that he was going to do all along was put the bag in his car, which is what he did. And this case is like that in a lot of ways. Mr. Alvarez had already made the turn onto Upriver Road. That's at Row 96, and he kept pedaling. The record says Row 97, so he just kept pedaling. That's what Officer DeLeon testified, about 75 yards, but there was no testimony that increased his speed, many sudden evasive maneuvers, or appeared nervous. In any event, Officer DeLeon, in all of his experience, has said that cyclists commonly ignore his request to stop even when he yells and honks at him. That's at Row 100. His doings also here is not reasonably suspicious, Mr. Alvarez's, and in addition, he was never charged with evading arrest. So it would be a very different case, Your Honors, if Mr. Alvarez had took flight or done something nervous or evasive when the officers had started honking at him. And I see my time is up for, I'll save it for rebuttal. Thank you. You have a chance for rebuttal. Mr. Chappell? Thank you, Your Honors, and may it please the Court. My name is Brent Chappell, and I represent the United States in this matter, and we are asking this Court to affirm the District Court's denial of the appellant's motion to suppress because the Corpus Christi police officers reasonably suspected, based on several identifying characteristics, that the appellant was the wanted gang member that they were looking for. Most notably, those characteristics include a bicycle with a unique set of large handlebars, the appellant's lack of cooperation, which was consistent with the information they had that the person they were looking for had previously absconded from police, and his location in a narrow geographic area, which was consistent with the information that the appellant had previously been found in that area. How big is that? Does the record reflect how large, Leopard, Up River, how big is that area? The record describes it in different ways, but the most specific description is that it was just that intersection, the intersection of Leopard and Up River. It was just the streets? Yes, Your Honor. And we also know that this individual, the appellant, was found just a block away, riding towards the intersection of Leopard and Up River. He was coming off of Old Robstown Road, turning on Up River, going toward the intersection of Leopard. So in that regard, it's a very narrow geographic area where they were looking. And I want to remind this Court, as it is well aware, that reasonable suspicion is a low bar. In Kansas v. Glover in 2020, the Supreme Court described the level of suspicion required as, quote, considerably less than proof by a preponderance of the evidence, and obviously less than probable cause. So that's clearly true. There has to be some sort of reasonably specific, I guess, descriptors. So what is your . . . and we have to look at the specific circumstances. So what's your best case from our Court, if you have one, that would say that this particular description, Hispanic male, bicycle with large handlebars in this area, what's your best case that there was reasonable suspicion? We don't have a best case for description. This is a unique set of facts that this Court should consider on a case-by-case basis, just like in all reasonable suspicion cases. With that being said, I think United States v. Flowers is a very good case here, which is why I included it in the 28J letter. That case, which Judge Jones wrote, I believe, stands for the proposition that a dedicated task force for a specific crime is important in this analysis, and the officer's training and experience in the specific area that is at issue is important. And here, we have a multi-agency, statewide roundup of wanted gang members, and that coordinated, specialized effort was the purpose of the stop in this case. And we also have an officer who has spent 32 years in the Corpus Christi Police Department and 28 years in the gang unit. Remind me, when you say you don't have a best case, and you say your case is the 28J, what was the case you said was best in your brief? So there were a few cases that we relied on. What was your best case in the brief? The best case in the brief, I believe that was mentioned, was Lawson, and that's the case that the lower court, the district court, relied upon, and in that case, we had a general description of an individual as far as physical description, and that was a tall, large-built black male. And then upon the encounter, that individual ran away. And I understand that this is not the same as flight. I am not suggesting that this case had the same facts as, such as Illinois v. Wardlow, where unprovoked flight was enough. They cited Jones in their brief. Jones seems very on point to me. It's a published 1980 decision. You didn't cite it. Can you address it now? Yes, and I disagree that Jones is on point. First of all, we had a slightly more specific description, but that description still fit many people. And that's just the physical description, mind you, because here we have many characteristics that are behavioral, that are consistent. Another difference with Jones, as Judge Jones said— I'm sorry. I didn't understand that. What are the behavioral characteristics? Sure. So we have an individual here who's riding a bicycle, and the person is known to ride a bicycle. This bicycle—another physical description is distinct large handlebars. It's quoted as large handlebars, but again, we have to view this evidence in the context of Officer DeLeon's training and experience. And he testified that the large handlebars we saw, which I provided a picture to the court previously, you can tell that those are unique. And he said those were consistent with what he had in mind. And he said they stand out, they're not normal, and there's only a handful of bikes like that. So that right there is a very individualized, particularized characteristic that was consistent between the person the officers were looking for and the person they saw on the street that day. As far as behavioral, we know that the person they're looking for is a gang member. They know that the person has previously absconded from police. And this is consistent. You know, I hear what you're saying, but if it is the law that a person does not need to stop if there's no reasonable suspicion, if that's the law, then how could absconding be part of the behavioral characteristics to stop someone? Do you follow me? I mean, was he doing anything illegal when he didn't stop for the police, or even suspicious? I do follow you, Your Honor, and that was not inherently illegal, no. But I believe what the appellant is focusing on is the wrong purpose. And the purpose why this is important in this case, primarily, is because it's consistent with the characteristics they know of the wanted gang member they're looking for. That person has previously run from police. You said a factor was lack of cooperation. Correct. I'm sort of curious, Judge, where did this guy not cooperate? When he was repeatedly told to stop, and he disobeyed those orders. There's no authority to tell someone to stop. There is with reasonable suspicion. But again, we know from, I'm sorry, it's the Hodari case, the Supreme Court case, that a detention does not occur until somebody actually submits to authority. So to say, the police can always ask somebody to talk to them. Exactly. They can initiate an encounter at consensual. When I say no, thank you, they can't infer anything suspicious about that? Well, I'm sorry, I apologize. That is precisely my point, in that I am not arguing that his decision to go forward and ignore police commands was inherently suspicious. I'm arguing that it's consistent with the behavioral characteristic of the person they were looking for, and that they had previously absconded from police and did not cooperate. Let me ask you a question. You said, you know, these policemen at the time thought that he was illegally riding on the sidewalk, and the police can make reasonable mistakes. So why are you not taking that into account? It doesn't necessarily raise good faith, but again, it goes into the reasonableness or unreasonableness of what the police can stop somebody who's going 30 miles an hour when under whatever circumstances it looks like 35, and that's a legitimate stop. So what's wrong with putting that into the calculus? Why aren't you mentioning that? There's nothing wrong with that, and I believe that goes to the officer's intent in their lack of bad faith. And their lack of bad faith, lack of harassing behavior is important in the reasonable suspicion analysis. We know that from the opinion of the United States Postal Service. Well, I thought the government had sort of begged off using that datum. What we have not done is specifically address the issue of the application of the good faith exception, and the reason for that primarily is because we believe this court could resolve this case on the issue of reasonable suspicion, which is squarely before it, but also the district court expressly declined to reach that issue. So I think the more appropriate result... Good faith is a matter of law. It's not a matter of fact, right? That's correct, Your Honor. Yes. I mean, the government has been reluctant to use good faith for a long, long time, and I've never quite understood that, but... I don't have an answer. What was Morales' warrant? What was the crime? We don't know exactly what the crime was, but we do know, based on the record at 102 and 103, is that they were going after violent criminals, gang members who were violent criminals, but we don't know... You don't know what the warrant was for the person that they're looking for? Correct. Okay, now the factual basis said, the government's factual basis submitted in court said that Alvarez matched the appearance physically as well as the bike. From the entire suppression hearing, what testimony would you point to that would say he matched the physical appearance of Morales? The physical appearance? Not the bike. What testimony was elicited by the government in the suppression hearing where an officer said he resembled Morales in this way? Physical appearance as far as his body is Hispanic male. That's it? As far as his body, yes, but that's not all we have in this case. No, I know. I'm just... The factual basis said he resembled Morales, and I don't know what physical appearance supports that. And I would urge this court to review the testimony at the suppression hearing, because... Well, I've read the entire testimony at the suppression hearing. The factual basis was not before the court at the time of its ruling. I know. I'm just... The government stood by. The government probably drafted it. They agreed to it. I'm just... I just want to make clear there's no physically identifying similarity other than the word Hispanic. Is that correct? Hispanic male, and I would submit that riding the bicycle with these unique handlebars is a physical description. Oh, okay. You said that absconded from the police was part of the description of the suspect whose warrant was outstanding, right? Correct. Was there any more detail than that, that he had absconded from the police on a bicycle? We know that it was in that area. You know what, yesterday we heard a case where the police intercepted a fellow on a report that there had been gunshots in an apartment, and he got into a red truck with rims. And sure enough, a few blocks later, they found him. So there was no... Nobody raised any question about the basis for the police trying to stop that person. Now, you could say, well, this was in propinquity to the immediate commission of a crime, but it seems to me that when you have a warrant outstanding for somebody, that means you have a warrant outstanding for them. Absolutely. This is an ongoing situation. He's in a constant, perpetual state of being wanted until he is captured. So there is ongoing crime, and that's important. Does the warrant tell us when... You said it doesn't tell us what crime. Correct. Does it tell us when the unknown crime was committed? It does not. You didn't even bother to put that in the record, huh? The United States did not put that in the record, unfortunately, no. Well, you could have, right? I don't know what exactly they had in front of them, but yes, theoretically, yes. I mean, is there anything in the record, you say gang task force, I get that, I get how important that is, but is there anything in the record where we could infer gang activity during a certain time period? I understand Leopard Up River. I'm struggling to find enough specificity, as you can tell. So do we know anything about the nature of the gang activity, when it was happening? You say it was violent crimes. We know from Officer DeLeon's testimony that they were going after violent criminals, people with warrants, gang members. Those are on the record at page 92, 103, 114, 153. And we know that this area is known for high crime and increased gang activity. Now, what I would caution against is taking a divide and conquer approach. This has been rejected by the Supreme Court, notably in the United States v. RV suit. This court needs to consider the totality of the circumstances together. So we're talking about several different factors here. And the appellant has attacked each one, isolated them individually, and attacked each one, one by one. But we have many different factors, and the confluence of those factors come together. Some are general. Some are more specific. And they all come together to meet this very low standard of reasonable suspicion. And so there's been a lot of reliance on this McKinney case. I think that was discussed briefly in argument. Just to provide a distinction there, the procedural distinction there is that there was no hearing or live testimony in the underdawing suppression hearing. And we know from this court's decision in United States v. Bass that the clear error standard is particularly strong when the court has the benefit of live testimony. And that clear error standard, again, takes into account the existence of a dedicated task force and the significant training and experience of the officer testifying. So are you making an argument about the collective—I'm sorry, I get this wrong—the collective knowledge? Are you basing an argument on that doctrine, on that idea, you know, that officers get information so they can rely on information they get? Collective knowledge is certainly important in this case, and it's certainly relevant. You can tell from the video that Officer de Leon at the time wasn't fully aware of all the specifics of the descriptors that they had, but it is clear from the testimony we know from the record at page 92 that they had teams throughout the state looking for gang members. We know that they were given information, and there was a follow-up investigation previously at pages 93 and 94. We know that there was information passed to the entire group, so there was some sort of briefing beforehand. That's page 108. And we also know there was a list of wanted individuals, and they received packets on each individual. So the collective knowledge doctrine—and I'm sorry, that's at page 153 and 154. And the government didn't offer the packet to inform—that is incredibly derelict—dereliction. Are you saying there's a packet? Who's the name of the guy, Morales? Jose Morales, yes, Your Honor. Not Morales. Was there a packet on Morales? That's what Officer de Leon testified to, and that's at page 153 through 155 is where he discusses it. Meaning there's information about Morales that's given via the task force briefing? Correct. But we don't know what that information is? Unfortunately not. But I still stand by the position that the record that we have is sufficient to meet the low standard of a reasonable suspicion. Briefly I want to touch on the term Hispanic. There was some discussion that this is a cultural term, and we can't really glean much from it. While I certainly recognize that this is a more general description and maybe less probative, it still nevertheless has evidentiary significance. Additionally, by labeling this as sort of something that we cannot consider because it's not descriptive, is a sort of scientific approach that the Supreme Court has repeatedly rejected in evaluating reasonable suspicion. Reasonable suspicion is supposed to be based on a layperson in light of the officer's training and experience. And I think it's reasonable to say that a layperson would have a physical association between the term Hispanic male and someone's appearance. De Leon probably has an idea what a Hispanic looks like. I'm sorry, will you repeat that? De Leon probably has an idea what a Hispanic looks like. Absolutely. And just the fact that maybe the term Hispanic fits a profile does not mean that it does not have evidentiary significance. We know that from the United States v. Socolow. I mean, I think you'd agree if the description instead had been Spanish speaker on bike. That gets us nowhere, right? Yes. I'm just asking counsel. Without hearing him talk, correct. But Spanish speaker is different than Hispanic male. I'm just saying this is difficult. Do you have a case that sort of helps us understanding, you know, black-white is one thing physically identifying. Do you have a case that you can point to where someone's cultural affiliation is a physical equivalent? No, I don't have a case like that. I'm asking counsel if he has a case. I'm asking counsel if he has a case. That's a legitimate question. Okay. We have a case here about a person named Valderez who is considered armed and, I mean, you have Hispanic males all the time. The judges will discuss themselves in conference, but I'd like to ask you again. Do you have a case that supports the proposition you're making now? Anywhere state, federal, where police can rely on a cultural term as a legitimate physical profile. Do you have a case? Not a specific case as to relying on a cultural term, but I would direct this court to nearly every Supreme Court case that discusses reasonable suspicion, and that is that it's not a hyper-technical or scientific approach. It's based on common sense. And again, I think a layperson would believe that the term Hispanic does have an associated – is associated with certain physical traits. I mean, there's no question that gang roundups are important. Recently, you probably read in the headline, in the French Quarter, they're rounding up sex traffickers. But it's really – you can't just say anyone that gets in a little pedicab can be stopped. It can't be anyone in the French Quarter that gets in a certain type of distinctive transport. That's not reasonable suspicion, so there's got to be something other than the bike. Well, it's important to remember that this bike is distinct. It's not any bike. Yeah, I know. But pedicabs are distinct. Scooters are distinct. But there are lots of them. There's no indication in this record that there are lots of these bikes. There's actually testimony – Okay, the government's got to put that in the record. The government can push good faith. They can put the warrant in. They can put on somebody that testifies as to how many bikes in this zip code. How many Hispanics in this zip code. But the government didn't do any of that. There are certainly shortcomings, but this court should not focus on the absence of affirming factors. This court should focus on the presence of affirming factors and the absence of negating factors. What I mean by that is there's nothing here that could have dispelled the officer's reasonable suspicion that this was the person they were looking for. There's nothing that told them they were wrong. This is Corpus Christi, right? Yes, Your Honor. We're talking about Corpus Christi. Is there anything in the record reflecting the Hispanic population of Corpus Christi? 70%. There's nothing in the record regarding the demographics of the area. No, but we can take judicial notice. It's a very high proportion. Certainly, Your Honor. So is there anything in the record that would reflect why the officers thought that Mr. Alvarez fit the description of a Hispanic male? I know that – I mean – they did not articulate what physical characteristics there were that were consistent with their idea of a Hispanic male. No. But again, I would urge this court to understand that my position is that the term Hispanic male, while it has evidentiary significance, I am not suggesting that it's the most probative descriptor that we have here. The most probative descriptors here are behavioral, and that's riding the bicycle. That is unique. It's a distinct bicycle. You can tell from the picture, and it's what Officer DeLeon had in his mind. We also know that they're in a narrow geographic area where the person had known to be found. A reasonable inference would suggest that the person resides there, knowing that he's known to be riding a bicycle in that area. And we also know – You're saying there's evidence in the record that Morales was known to reside in the area? Because I didn't understand if he was known to ride a bike in the area, or was he known to reside in the area of Leopard and Upriver? He's known to ride a bike in the area. I'm suggesting that there's a reasonable inference that he's known to reside. The district court found that he's known to reside in that area. Those words were not uttered on the record. Morales or Alphonse? I'm sorry. Morales. The person they were looking for. Reside. So that was in the district court's findings, but what I'm saying is that there was no testimony specifically to his residence. There was testimony that he was known to be and previously located in that area. I see. But, again, the fact that he's riding a bicycle supports an inference that he likely resides. Suppose if it were bad guys riding a unicycle. Probably enough. Reasonable suspicion, right? I see my time has expired. Can I answer?  Your time has expired. You have a chance for rebuttal. No.  Too bad. Your time has expired. This is repetitive. Thank you, Your Honors. Thank you. There was a question about the Hispanic population. I looked at the quick facts of the census on census.gov, and it says that 63.2% of Corpus Christi is Hispanic or Latino, and 50.5% is female, which means that just under 50% is male. And that's at census.gov slash quick facts. Okay. You know. If the police were looking for Morales and he's known to ride on a unicycle, and then they see just a male on a unicycle, I suppose that might. Right? That's getting pretty distinctive. That would be more distinctive, Your Honor, than a bicycle with large. It comes down to the large handlebars. So this is not a distinctive bicycle? There's no distinctive marks on it like. Oh, give me a break. You just don't see these kinds of handlebars. I mean, I know you can ask your rhetorical questions on the stand, but. Your Honor, those are called easy rider style handlebars. They're sold at Amazon and Walmarts. Is that in the record? No, Your Honor. All right. We don't want to hear what's not in the record. Speculation about bicycles. There's a ñ the bicycle has a particular style of handlebar, and what's important to our argument here is that Officer DeLeon admitted that he didn't know what style, what large meant. He just thought it meant regular, you know, it stands out. Well, that's not articulable suspicion. The officer is required under Terry to articulate. Oh, come on. If you say it's a dark, if it's a dark compact car, an officer in my neighborhood can pursue a dark compact car when somebody says someone just got into that car at a certain, you know, got into that car at a certain location after doing something suspicious. In other words, I'm not sure why the description of a unique sort of bicycle, an unusual type of bicycle, why you have to go to a unicycle in the realm of less than four wheeled vehicles when you can go after a red truck with rims or a dark compact car under the proper circumstances. It's part of the totality. I understand your point, Your Honor. But this judge could not articulate that. He did not understand. I mean, this officer, Officer DeLeon, could not articulate that, and that is important. Why did he have to? That was for his common sense and for the judge to say, I look at what he said and that seemed reasonable. Well, because he lives there. She's in a, you know, position to articulate that. I understand. But he saw the bike afterwards, and they were standing around the bike, and it's easy for the officer afterwards to say, okay, yes, that's got large handlebars. Well, he didn't. It wasn't a tricycle Schwinn, right? I mean, this is a bicycle with large handlebars, right? Right. Let's not argue about trivialities. I mean, what has not been covered in this argument? Your Honor, I will say that while we're on this, I will point you to Jaquez, which is a case set in our brief, and that this bicycle with large handlebars is sort of like red vehicle in Jaquez. In that case, this court held that the officer did not have reasonable suspicion to make an investigative stop at the defendant's vehicle based on the fact that he was driving a red vehicle in the general vicinity of a shooting incident reported 15 minutes earlier, late at night, in an area known for its high crime rate. When was that decided? I think it was 2005. And this court found it significant that except for its color, the officer had no particular information about the vehicle or any description of its occupants. And our position is that this description of the handlebars is similar to red vehicle in Jaquez, it's broadly generic, and that the officer cannot articulate how these handlebars were large. And there's many kinds of bikes with large handlebars, beach cruisers, easy riders, big grips. You cited supportively the Sixth Circuit. I didn't read that case. Johnson. That case is related to the issue of flight and whether it's reasonable suspicion. That's the man walking and how he had a right to continue walking at the same pace. And I'll make one last point about things the government failed to do. Why didn't the government have a booking photo of this man if he's wanted and known to police? That would have been much easier. But we don't know whether they did, do we? We don't know. They didn't provide it to their officers. They provided only a vague general description. And in this case, that's part of the reason why they pulled over the wrong guy. So, Your Honors, unless there are any other questions, I'll rest. Thank you.